Good morning, Your Honors. I'm Elizabeth Brancart, and I'm here representing the appellants Avenue 6E Investments and Saguaro Desert Land. I'll try and reserve two minutes for rebuttal. This case raises two very significant issues under the Federal Fair Housing Act. One is what is necessary to state a plausible claim for relief under Iqbal. What's necessary to state a plausible claim for relief for intentional discrimination under Iqbal? And the other is whether to state a claim of disparate impact under the Federal Fair Housing Act, one needs to show a shortage of housing, showing that there are not any other available housing opportunities. So one of these two was under summary judgment, and one was under 12B, right? That's correct. The intentional discrimination was under 12B-6. The summary judgment was the disparate impact claim. Oh, my same question. So, okay, but do you agree that in order to prevail on your disparate impact claims, you must show that the zoning decision would have a significantly adverse or disproportionate impact on Hispanics? And if so, how can you prevail given that the purchasers of your homes would be 50% Hispanic and you admit that the city of Yuma is about 50% Hispanic? Isn't that proportionate impact as opposed to disproportionate? That is correct. That is proportionate. That's what they wanted to build, but that's not what was able to be built because of the denial of the rezoning. The evidence that we put forward on summary judgment was that if the rezoning had been granted, the plaintiffs would have built a housing subdivision that would have been in a price range that would have been affordable for persons that were in the market at that time to purchase an entry-level home, whereas by leaving the existing zoning in place, if something was built there, it would only be affordable by people in a much higher income bracket, which was disproportionately white and much less Hispanic. So that does show a significantly disparate impact. What's your evidence on that, though? I didn't see, I don't, what evidence did you put in the record on that? You mean to show the impact? Well, that disproportionate. It's disproportionate because... The question is whatever, you made a statement that it would, if it went to 8 instead of 6, you said if it was 6, it would be 50%. If it went to 8, it would be much less. Yes. And the question is what evidence is there that if it were at 8, if it were at 6, it would be 50%. If it were at 8, I think it's 30%. Okay. That evidence was based on Home Mortgage Disclosure Act data, HMDA data, which shows for who actually is purchasing properties and the amounts they are paying for their properties and their ethnicity. And we showed that during the period of time that was relevant, that in the proposed price range that the plaintiffs wanted to build in, that they could expect that 50% of their purchasers would be Hispanic, which was also in line with their historic experience, was that 50% of their purchasers were Hispanic in that price range. But that by denying that, excuse me, and then that people that were purchasing in the price range of the surrounding neighborhood properties who actually did purchase were much more heavily white and had higher incomes. Well, they were white. They were 70% white. So that shows a disparate impact. By taking away that housing opportunity, the city precluded the building of properties that would have provided, that would have been purchased by 50% Hispanic people and would be reflective of the city of Yuma. That wasn't Judge Sedgwick's analysis, was it? No. His analysis was because there existed other properties in that price range that a disparate impact could not be shown. Now, what's wrong with that? I'll call it economic theory, I guess. Well, there's several things wrong with it. One is, and it's discussed at length in our brief, is that the Fair Housing Act, it's protecting housing opportunities, and this is reflected both in the HUD regulations and in Judge Kennedy's recent opinion in the Inclusive Communities case, upholding disparate impact as a method of pruthum to the Fair Housing Act. Is that Justice Kennedy? But he does say... Oh, justice, I'm sorry. There is no justice. Oh, there is no justice. There is no justice on the Ninth Circuit, but I think he still would like to be a justice. But his opinion does, I mean, you know, he does say you have to show a disparate impact. The question is, I guess, what the proper test is, right? What is a disparate impact? Well, a disparate impact is something that... I can grab the HUD reg. Well, it seems to me, you see, Judge Sedgwick's analysis is certainly, you know, at least a sensible alternative, isn't it? It is if you assume that there's no violation of law if someone can go get housing somewhere else. For example, take an employment case. If an employer has a rule that disproportionately negatively precludes women from getting a position with that employer, the fact that they can go down the street and get a job with another employer doesn't make that rule not cause a disparate impact. Judge Sedgwick adopted the Eleventh Circuit view that as long as you can get a house somewhere else, then there can be no disparate impact in the neighborhood you're talking about. The Eleventh Circuit's view is as long as there can be housing somewhere, there's no disparate impact in a particular neighborhood. That's correct, and that's... And that's the view that Judge Sedgwick adopted. He adopted the Eleventh Circuit opinion. That's correct. And the issue really for us is whether we want to adopt the Eleventh Circuit opinion and say as long as you can get housing somewhere, then there's no disparate impact in the area you're talking about. Exactly, and I think just stating that, as you stated it, the answer has to be no, that that cannot be the standard. Well, but if we take yours to an extreme, then every place could only be where it would have to be affordable to everyone. And some people have more money than other people. You know, Your Honor, that would have to be looked at on a case-by-case basis, and that is actually something that's recognized in Justice Kennedy's opinion, is that the Fair Housing Act is designed to outlaw unlawful zoning practices and other housing restrictions that function unfairly to exclude minorities from certain neighborhoods without sufficient justification. Our case is that in this neighborhood, they were excluded without sufficient justification. It doesn't matter that miles away they could get another house. That is not... But if a whole subdivision, if it costs a certain amount of money to go into it, you know, if that's then all of those, that could never happen. You could never have a subdivision that was priced higher than what everyone could afford. That's not true. What the Fair Housing Act is preventing, or is designed to prevent, is precluding people from building. This is a barrier that was put in the way of an attempt to build a property that was affordable. Maybe you can help me on this. I think your disparate treatment claim is better, okay? Okay. What's the difference in impact having both of those in terms of remedies? On the case? Yes. In terms of remedies at this point... Well, let's just assume hypothetically, and I'm speaking hypothetically. If the Court were to reverse on the disparate treatment but not on the disparate impact, how does that... Affect the case? We would go back down and... No, but how does it affect the remedies that are available to you? Nothing, nothing. It doesn't... Just so you don't get... Go ahead and finish answering Ms. Callahan's question, but... There are different theories for the same violation, so it wouldn't affect the case. Because sometimes different theories have different remedies. Exactly, exactly. In this case, what's significant is that the plaintiff's lost the property, so there's no injunctive relief that would require the city to now rezone it. But, so it's... No, there's no difference in the remedies under the intentional versus the disparate impact in this case. Just so you aren't misled totally, I think you have a better disparate impact case than a better disparate treatment case. See? So you start out not pleasing both of us, but maybe one, or maybe neither. And I think to go beyond this, because as I see it, whether your client gets the money or not is not of very much interest to me. But I think we have a case, which is one of the... since the Supreme Court decided that disparate impact was a legitimate theory, and we have to fill out what that means. And Judge Sedgwick thought that the Eleventh Circuit view, which would forbid you to look at the neighborhood to see whether that was a segregated neighborhood, that that was the way we should approach these cases. Now, just because you show that only wealthy people can reside in a particular area being zoned certainly is not enough to win a disparate impact case. You have other factors that you have to show as well. Exactly. Otherwise, every time you had zoning that only permitted large houses, there'd be a violation. But to show the disparate impact isn't the end of the case. Correct. But I think one of the things we have to do is to see whether Judge Sedgwick was correct. And this was the basis of his granting the motion for summary judgment. Later, your opponents filed a second motion for summary judgment, which he didn't consider because he had already ruled on the first. But on the first, it's based almost entirely on the idea that as long as minorities can find living spaces... Somewhere. Somewhere, including if blacks in Los Angeles can live in Watts, then everything's fine. I would hope that's not a view that this Court would adopt. But that's the essential issue before us, I think, on the disparate impact case. And... That's correct, Your Honor. And what I would suggest for the Court to look to guidance is the HUD regulation that was promulgated in 2013, which is referenced a number of times in Justice Kennedy's opinion. And it explains how a disparate impact is shown, and it also explains the balancing, the next steps, the prima facie case, the rebuttal that there has to be a substantial legitimate governmental interest, and then that that in turn can be rebutted by a showing of a less nondiscriminatory alternative. Getting back to the issue of whether or not every zoning issue becomes a disparate impact case, Justice Kennedy explicitly states that once you show the impact, that's not the end, that there both has to be an impact and there also has to be a causal connection, which has long been the rule, a causal connection between the practice or the ordinance and the disparate impact. And then, in addition, the government has the opportunity to explain its legitimate governmental interest. So most of these cases would never be brought because it's so clear that there's a governmental interest. But in a case like this, it's an unusual case when there's simply the governmental interest is lacking, and it becomes a situation where people are deprived of housing opportunities in certain neighborhoods without justification based on stereotypes, based on negative views of what they are going to do to the neighborhood. So this is the kind of the, as Justice Kennedy described, the heartland case of disparate impact. This is the kind of case that disparate impact was intended to be for, to be designed for. And the fact, I mean, the whole purpose of the Fair Housing Act adopted in 1968 was to make housing opportunities to stop, to integrate neighborhoods, to stop segregation. So if you're suing for a disparate impact on a decision that has excluded people from a neighborhood, then that is exactly what the Fair Housing Act was intended to remedy. And it's saying that some people can have a housing elsewhere is not, does not defeat the showing of the violation. You're out of time. This is our last case of the morning, and it's a reasonably significant case. So I think we'll give you each additional time. If you want to save yours for rebuttal, you can, and we'll give you enough time in rebuttal. We'll give the other side extra time as well, because I want you both to be able to have a chance. We want you both to be able to have a chance to argue this case fully. Thank you. Okay. Good morning, Your Honors. Good morning. May it please the Court, Andrew Jacobs for the City of Yuma, the appellee. And I'm really excited about the questions all three of you asked because you kind of hit on where I already wanted to go. I'd like to start by turning to the concerns addressed in Judge Callahan's question, and then Judge Reinhart discussed the Hallmark case with you, among other things. Judge Callahan, the 50 percent thing is— Just relax. Take it easy. Sorry. You're too charged up. Okay. Sorry, Judge Reinhart. The 50 percent thing is why this case has to be affirmed, even if you hate Hallmark and don't want to adopt Hallmark. The 50 percent thing completely dooms their appeal on the disparate impact case. When you look at the— Why is that? If you had, say, a completely white neighborhood in half of a city, and the city was half Hispanic, and you had 50 percent white, and that 150 percent lived 100 percent in one half of the city, and the 50 percent of the Hispanics lived 100 percent in the other half of the city, there'd be no remedy for that? No. It's just like your question about Watts, Your Honor. It's the exact same kind of thing. You said, I think, if blacks in L.A. can live in Watts, then it's okay under the Eleventh Circuit rule. And that's the opposite of what we're saying. Not only is there not a disparate impact in the 50 percent circumstance present here, there is the opposite of a disparate impact. Their own evidence, if you go to ER-860, which is the Yuma Census data from 2010, is that white is 38 percent and Latin is 55 percent. You take those data, and they're saying the affected area denied dwellings within the FHA to an expected occupancy group that would be 50 percent white and 50 percent Latin. So you have, in a city that's 38 percent white, 50 percent of those denied that dwelling are white. In a city that's 55 percent Latin, you have 50 percent of those who are denied the dwelling are Latin. That is an under, that is an opposite of a disparate impact or a negative disparate impact ratio. And as far as the Watts part, which I'm eager to address, Judge, that's the opposite of what they pleaded. They pleaded that lots of Yuma is segregated and 75 percent Latin. They pleaded that specifically the southeast area is predominantly white. And so when you look at what they pleaded, the area in which this housing exists is the predominantly white area. So it isn't the case that we're saying someone can find housing in Watts metaphorically. We're saying there's tons of other housing in the supposedly predominantly white area of Yuma, which is their chosen geographic area that they think is preferable, that they wish to integrate, that their claim advocates for, Your Honor. And that's the area in which we have shown, and it's undisputed, they've admitted that in Statements of Fact 23 and 25. How does that differ from the Eleventh Circuit rule, what you just said? There's a couple things about that. Well, I was addressing the point that no one's trying to put people back into the theoretically Latino segregated areas of Yuma, which was the premise of Judge Reinhart's question. And I think these facts do not square in this case with that premise. But I do advocate for the Hallmark standard because I think ultimately, and, you know, I don't have to sustain the burden of suggesting a shortage element. I don't need to show that. It goes back to the very wording of Judge Callahan's first question. There is a need here to show a significant disparate impact on Hispanics. And circuit authority in the Ninth Circuit is what is relevant for that. We don't do it by inference, gamble. We don't do it by mere suggestion. We do it with a real statistical proof. And they've chosen the wrong statistical proof to make a comparison. They're saying, well, Baletza II to the south is more expensive. Well, we're not here to argue about an ordinance requiring poorer people to buy a house in Baletza II. We're here to talk about a deprivation of a right to buy a dwelling in the subject property. And that goes to the circuit authority, Derensburg, and they've committed the same logical fallacy in their analysis that this court properly called out in Derensburg. If you look at Derensburg, the same general logic chain is present. There was a theoretical underfunding of bus service in relation to rail service, and this court held that it was not discriminatory, even though as a general matter in the relevant metropolitan area, more minorities rode buses, that that didn't show a disparate impact. You had to look what in that case was, quote, the subject property. In that case it was, well, which bus lines are we talking about, and are those predominantly minority or disproportionately minority? Let me maybe state the question a little differently so I understand what you're arguing. As I understand the claim here, it's by developers who said, right, we have this plot of land, zone what, R-8 or something like that? R-8 originally, yes, Your Honor. And we want to down zone it to R-6, right? Yes, Your Honor. And the city said no. And the claim is now if it could have been down zoned to, say, R-6, they could build cheaper housing which would be more accessible to Latinos, right? That's what they're saying. And they're saying the denial of the zoning results in a discrimination under the Housing Act because you're depriving the Latino population from moving into this neighborhood. Isn't that their claim? Or is it something else? Well, no, sort of, Your Honor. What we're saying here is that the relevant neighborhood, which is highly relevant to the point here, is southeast Yuma. They picked that in their pleading. That isn't us forcing them into a weird or arbitrary proof. Their idea is that the neighborhood is southeast Yuma, which they said originally was 75 percent white. On summary judgment, they're saying, eh, maybe it's 48 to 65 percent white. So that's the relevant neighborhood. And we are saying there's lots and lots of R-1-6 housing, some of the exact same house type, Sunrise, and that that is in the same neighborhood for the purposes of the relevant analysis. So right there, right there, you're adopting the 11th Circuit test, right? Because there are other similar housing, similar price housing available in the same southeast Yuma area. I'm making two different arguments, and I'd like to pull them apart, please, Your Honor, because I think I may have conflated them. On one hand, I am saying that Hallmark is right and that there is other housing available in their chosen neighborhood. And for that reason, they cannot prove an impact on minority groups. I am saying, completely separate from that, that their chosen proof of impact is the opposite of disparate impact because of the 50 percent point we started our discussion with, because Yuma is 38 percent white at ER-860, in their evidence, and it's 55 percent Latin. And it doesn't make any sense. Are you talking about the overall population of the city of Yuma? Yes. Yes, Your Honor. And the general population numbers are the ones that we are supposed to look to under the Sambelidis case in the 2nd Circuit, which was adopted as the right measure in the 9th Circuit case I quoted earlier, I think, Derensburg. And so when you look at the general population, you're seeing that there's actually the opposite of what they're saying. And very instructive, Judge Tashima, on this point is, please consider what they promised and what they delivered. In paragraph 47 of their complaint, they said that they expected 77 percent Latinos because they said, basically, we have a development that is what we call affordable housing, which, by the way, is not what HUD calls affordable housing. It's much less dense and higher scale. But anyway, they have what they call affordable housing, and based on that prior development, it was 77 percent. Now we get to summary judgment, where the rubber meets the road, and we're finding out, well, they only predict 50 percent occupancy in a city that they're now saying is 55 percent Latin, on their own terms, on those facts. You don't need Hallmark. You don't have to like Hallmark, Judge Reinhart. You don't have to, in this opinion, say that you adopt Hallmark. That is a simple, flat-out failure of statistical proof following this Circuit's narrower precedence, which you could stand on. I say that it's going to be 65 percent white to 30 percent Hispanic is what their figures that they offer are, whereas if it's on 8, if it's on for 8 and that it would be 50-50, it's on for 6. I think, Your Honor, their papers are to the contrary of that. And in the reply brief in this Court, in page 32, they are saying that the expected occupancy is 50-50, and that is from the further excerpts of record at 94-95 that they put in the record. And what the 65-30, Your Honor, is referring to is their breakdown of the already existing separate neighborhood immediately to the south, and that is a completely misplaced comparison that has no place in this Circuit's law. I don't see where they say it would be 50-50 out of 6. You may disagree with their statistics, but their statistics are that a 6 would be 50-50 and, I mean, that an 8 would be, 6 would be 50-50 and an 8 would be 65-30. Well, they do say in their reply brief that they're expecting that it would be roughly equally occupied by Latinos and whites. That is page 32. And their summary judgment materials at FER 94-5 do contradict what you said. This would be 50-50 if it was 6. I don't – are you disagreeing with that? I don't know that – I'm not seeing how the two of you are disagreeing. I think – I think you're right, Judge. I think that I'm saying – I'm saying that the relevant analysis is of the subject parcel, and the data I think you're talking about, Judge Reinhart, relate to the parcel to the south that was already built with more pricey homes. No, no, no. I'm not talking about that. I'm saying what they say it would be if it were zoned for 6 and if it were zoned for 8. Yes, Your Honor. They're saying if it were zoned for 6 that it would be – 50-50. 50-50. And so that's the deprivation that we're talking about here, whether that's actionable as a disparate impact, when you don't let people do that 50-50 there. That's what we're saying is the violation. As compared to when you make it two-thirds, one-third, or more, 65-30, by zoning it 8. I understand what you're saying, Your Honor. And I guess what I'm saying is that the relevant deprivation is not having a 50-50 parcel there. The relevant deprivation isn't forcing people to buy houses. No one's making them buy across the way. And there's also – That's a different question. That's not the figures question. The figures show that there's at least a genuine issue of fact, a summary judgment, as to whether zoning it 8 rather than 6 has a disparate impact. Now, it may be that there's another solution by having them buy property in a particular half of the city, but not in a particular specific area of the city. I mean, you can go one mile and a half from Beverly Hills and find a minority area. It depends on how you draw and what you're interested in. And one of their arguments is that keeping the minorities out of a particular area here and making them move over to another segregates the community. Well, Your Honor, as to the Beverly Hills versus a neighborhood that is predominantly minority, they are the masters of their legal theory. And they, as the masters of that theory, decided that southeast Yuma in total was Beverly Hills. And there's lots of other housing in Beverly Hills, using that idiom, that's available. They've pled it. They've admitted it in their responses to SOF 23 and 25. There is the Ocotillo 5. There is the Saguaro 1. There is the Trail Estates. Lots of what they call affordable housing. They pleaded that Trail Estates was basically about the same thing in either Paragraphs 43 or 47 of the first amended complaint. They say it's basically the same kind of affordable housing. And so it's in southeast Yuma. They admitted that. Now, they didn't have to admit that. If they wanted to say the only relevant neighborhood was this little tiny place, they could say that. But they didn't say that because it recurs to Judge Callahan's question, which is, are you going to just drill down on one little area and say, well, this is the whole relevant neighborhood, so you can never zone for expensive houses? And that's where their argument takes them inexorably, and it doesn't make any sense. But let me understand if I — let me make sure I understand that if the panel were to accept your legal analysis, you're saying that the panel would never have to get whether to the issue of Hallmark, and there's already a split in the circuit regarding — the split in the circuits regarding Hallmark, right? I mean, there's — we would just be adding to it. There's a case in the Fifth Circuit that — there are cases that talk about housing shortage that seem to me consistent with Hallmark, but you don't have to go there. Absolutely, Judge Callahan. Well, but is there — I mean, but isn't there already an existing split? I'm aware that there are cases saying that you need to have a housing shortage and that where there's all this other available. I'm not quite sure of the contrary position, how well represented that is. All right. Maybe on your — I think that you may have some problems on now. The disparate treatment was handled at the 12B stage, correct? It was because of the conclusoriness, the complete lack of evidence of race allegations, and the sort of nested hearsay nature of, you know, statements that people are making in the general public which aren't on their face racial, and then the — Well, they — if you look at — but they also wanted to amend the complaint, and I think that they were denied that Yuma City Council approved all of 75 other supportive of the plaintiff's contention that the City's denial was contrary to its regular zoning practices. Because this went — it went approved all the way through, and then we have the hoo-rah-rah at the, you know, at the City Council where people get up and I — if I were to make the appellant's argument, I think that they would be saying that the concerns that people were voicing about parking and crime were really code words that had to do with racial animus. So why haven't they at least made a prima facie case there and that they shouldn't be allowed to amend the complaint? And then maybe at summer judgment, maybe it's a different story. But this is 12B-6, right? It is 12B-6, and my response to that is twofold. And I'd start with the second amended complaint point you raised first, Judge Callahan, and then backwards to the allegations. As to amending the complaint, when they went ahead and put that in, they gave a chart showing, you know, there are about 75 other instances of zoning and that the general outcome is that requests are approved. But what is left unsaid in that is that this is a very unusual situation because what you have is a situation where you had an area that was zoned R-8 already, and there were people who had already moved in and it was zoned R-8 in the neighborhood that was already developed. And then you're saying, oh, well, you moved in and you thought the neighborhood was like this, and now after you moved in, we're going to change it. And those are the people who are complaining. So you have a pretty unusual situation in that regard. In fact, the chart shows the very opposite of plausibility on these allegations because it's — Well, except I'm just wondering if not, yeah, I think that the builder, obviously there was a financial collapse. There were any number of reasons that they couldn't do that, and that might be something that a trial would determine, that there was an intentional discrimination. But that being said, at a 12b-6, isn't there at least circumstantial evidence supporting each of the Arlington Heights factors for making a prima facie case of intentional discrimination? I don't think so, Judge Callahan, unless one takes the position, which I think is a whipsaw, that if you deny one application, that's invidious. But if you denied 15 of them, you know, the argument they'd be making, that's invidious. Because look at this pattern of not letting people have R-6. Yuma always lets people have the R-6, and that developer had the R-6. Well, and everyone said they should get the R-6 until everyone showed up at the city council and, you know, created — you know, talking about how it was going to be a graffiti, it was going to be, you know, people that commit crimes, you know, all of those went on. And they said those things. The people said those things. And apparently the city council listened to its constituents and kind of got — started thinking about reelection, maybe. Well, it is a parade of horribles. And I think that when you look at this, the question is, you know, in what language are members of the public allowed to say, I don't want half of my neighborhood rezoned to be less poor or more affluent? One could, on one hand, say, you know, the things they're saying about poorer people are not things you like to hear. You can recognize that and embrace that proposition, as I do, and still say it's not invidious, it's not racial. Are they allowed to say anything? And the city council is allowed to listen to them, and this is a weird situation. This isn't a situation where the city is denying R-6s ever and saying, you know, we're not going to let R-6 in southeast Yuma. This city lets R-6 all over the theoretically all-white area of southeast Yuma, majority white, okay? So that's not presented by their own allegations. Their allegations are we generally do allow this, and I'm not aware of any public comment in favor of the downzoning here. You're looking at the affected neighbors are coming in, in a very narrow, fact-specific situation, and the mayor said, how about we compromise? You keep most of your R-6. We'll just put a little R-8 around the edge to placate those people who are complaining. Not only does that strongly suggest the opposite of invidiousness in their motives, but then they said, no, we don't think that's appropriate. And that's in their statement of facts on summary judgment. So they declined to compromise, which is why the mayor said no. The mayor wanted a compromise, and that's not what you do when you're invidiously trying to keep people out. So I think that that one additional fact doesn't add that much for them at all, and I think when you look back at the five factors, I mean, we think about the Pacific Shores case, and just look at all the messed up procedural stuff that was in the case. There was a task force, an ad hoc committee. There were secret meetings. This isn't procedural shores. This is not as egregious as procedural shores, but clearly you're right about that. Okay. Okay. You know, I've got almost five minutes. We'll give the other side four minutes, so okay. Thank you very much, Your Honors. Let me ask you a question. Counsel's argument is that you chose as the area of comparison half the city, I guess. Was it southeast Yuma? And you said that that's the area rather than a lesser area where Hispanics are disproportionately affected. Let me address that. First of all... They're saying it's not that they can go somewhere in the other half of the city. It's that there is room for the section you chose as an area that would be disproportionate, won't be disproportionate, because they can reside in other parts of that limited area. What's your response to that? First of all, in the complaint, which is what counsel was citing to, it's a discussion that there is historic discrimination in Yuma, that historically there was 75% Latino up in the north and then a much wider area down in the southeast. And then after the filing of the complaint, the 2010 census came out, and that is where it then said that those numbers had been reduced. However, where the property sits was still a concentration of white population as the city itself in its planning documents... Well, you're still... I'm not understanding. Did you pick that area in your complaint or didn't you? Yeah, but we didn't pick it as a comparator in the complaint. It's a factual statement. Well, but the summary judgment response to the complaint. So what is the complaint? The summary judgment response to the complaint was... And that's what we're dealing with. ...that this neighborhood was excluding, they were being excluded from this neighborhood. I mean, that's the summary judgment. And it was clear that the neighbors and the people were concerned... Did you pick as the neighborhood? The neighborhood was the map that is in the briefs at page, I don't know, it's probably like page 20 or so. It's a map and it shows the properties that are immediately surrounding the neighborhood. Which is much smaller than southeast Houston. Southeast Yuma is much larger. And so I think it misconstrues our complaint to say that we had said this is the comparators and so what if it said, if we said that in the complaint, as the case developed, this was what was the summary judgment. This is what came after all the discovery. Well, it does matter what you say in your complaint. Well, it does, but we didn't... That's because I think summary judgment is within the corners of the complaint. It is. So it does matter. It is within the complaint. I think that the fact that there was a 2010 census that came out in between the filing of the complaint and the summary judgment has, I mean, I think it kind of is in favor of us not trying to hide the ball or anything. But I also want to say that on the issue of the intentional claim, basically in this case you'd have to say the only thing that we were still required to show in order to show, raise the inference of intentional discrimination was an actual statement in the legislative record that the city was intending to discriminate. But we put basically everything else that you could have in there. Most people don't say that. Exactly. Exactly, Your Honor. Occasionally people do, surprisingly. Occasionally. But most people don't say that. Exactly. So that's the point. It's the same type of problem. But that's the issue. And also just to point out that the facts that counsel was reciting in support of why there was no discrimination come from the summary judgment record, not from the face of the complaint itself. Any more questions? Thank you, counsel. Thank you, Bud, for your helpful argument. Thank you. Case discharge will be submitted. Court will stand in recess for today.
judges: Reinhardt, Tashima, Callahan